No. 42,340

Georgia Kline, *Appellee*, v. Ralph Ash, James Andrew Jacobson and Fred Jacobson, his father and natural guardian, *Appellants.*

(366 P. 2d 276)

Opinion filed November 10, 1961.

*Evart Mills*, of McPherson, argued the cause and was on the briefs for the appellants.

*David W. Wheeler* and *Edwin G. Westerhaus*, both of Marion, argued the cause, and *D. W. Wheeler*, of Marion, was with them on the briefs for the appellee.

The opinion of the court was delivered by

Robb, J.: This is an appeal from a judgment in favor of plaintiff for personal injuries received in an accident involving a water truck and an automobile in which plaintiff was riding.

On Sunday afternoon March 15, 1959, plaintiff Georgia Kline, who was sixty years of age, and her husband, Harry Kline, who was sixty-six years of age, drove from their country home northwest of Marion to Emporia to visit their son and daughter-in-law. The family car, a 1952 Pontiac, was driven by Harry Kline. On their return trip home that evening at about 9:00 p. m. Mr. Kline was driving west on a country road six miles north of Marion. The road was twenty-one to twenty-three feet wide and was surfaced with a heavy covering of large-sized chat, rock, or slag. The small amount of traffic using this road had worn two tracks approximately in the middle thereof which had the appearance of being smooth.

There was a banister bridge twenty feet and one inch wide at the point where the road crossed Schemblin creek. A great amount of water was used in the oil fields located in that vicinity which was obtained by operation of water trucks going to this creek to be filled and then hauling the water to the different leases. The trucks were generally parked somewhere on or about the bridge, long hoses were put into the water, and the water was drawn into the tanks by suction pumps.

The country road in question proceeded from the east over a hill to the west. Approximately 150 to 200 feet east of the bridge the road leveled out so that car lights would show what was ahead on the bridge for that distance. On the north side of the road at the east end of the bridge there was a washout, or a hole, where the rear wheels of the water trucks had made depressions and it had the appearance of a washout and made the road narrower, or at least made it appear narrower to a driver approaching from the east.

Defendant Ash owned four water trucks and these, along with some twenty or thirty other similar trucks, obtained water from the creek. The particular truck in question carried about 1,500 gallons of water.

On this occasion Jim Jacobson, the driver of the truck, stopped on the south side of the road facing west with the front wheels of the truck on the bridge and the rear wheels on the road at a lower level than the front wheels. In pumping the water the motor of the truck had to be run slowly in order to operate the power take-off properly. It took about twelve minutes to fill the tank. This would weaken the generator and Jacobson would turn off his lights and this is what he had done immediately prior to the accident. The rear end of the truck was muddy and dirty and as the tank was being filled Jacobson and a friend were sitting in the cab of the truck with the radio turned on listening to some music. The car in which plaintiff was riding came over the hill from the east at approximately fifty miles an hour. Neither plaintiff nor her husband saw the truck, or any lights thereon, or anything else to warn them of its presence. The car laid down 127 feet of brake marks and was still traveling about fifteen miles an hour when it collided with the rear end of the water truck. At the time the skidmarks started the left wheels of the car were approximately seven feet from the south edge of the roadway. The car apparently had been

traveling in the track established by the vehicular traffic. Plaintiff was not shown to have objected to her husband's speed or how he drove the car. Both of them saw the truck at approximately the same time and she exclaimed, "Look out" or "Be careful."

Jacobson admitted he had had the lights on the truck turned off prior to the impact but testified he had turned them on again as soon as he noticed the headlights of the approaching car in his rear vision mirror. However, a highway patrolman, as well as the sheriff and undersheriff, stated the lights on the truck were not on. Ollie White, who drove an ambulance to the scene, stated that in his vague memory he thought he remembered the clearance lights on the truck were on when they arrived, but Bill Meyer, who accompanied White in the ambulance, stated the truck was dark when they arrived although the two clearance lights were on when they left.

While defendants requested certain instructions, a careful study of them shows they either have no application or they were given by the trial court and, therefore, we think it unnecessary to go into full detail regarding defendants' objection to the refusal of the trial court to give all of their requested instructions.

In regard to the instructions the trial court did give, which are set out in full in the record but need not be repeated here, an examination of them shows they fully, impartially, and completely cover the case and state, in substance, the words of the appropriate statutes. (G. S. 1959 Supp., 8-532 [b] [3]; G. S. 1949, 8-570; 8-572 [a] [13]; 8-581; 8-586.) Particular objection was made by defendants to instruction 13 in regard to imputing any negligence of Mr. Kline to the plaintiff. In view of the discussion later contained herein on this point, we are unable to state that on the record before us this instruction was improper.

The jury returned a verdict in favor of plaintiff in the sum of $15,290.55 together with answers to twenty-two special questions as follows:

"1. Was the north half of the roadway in the vicinity of the Ash truck open at the time of the collision? A. Yes—open to nominal speed.

"2. How far east of the Ash truck was Georgia Kline when she first saw it? A. 175-200 feet.

"3. How far east of the Ash truck was Harry Kline when he first saw it? A. Approximately the same.

"4. Did Harry Kline apply his brakes as quick as he could after he saw the Ash truck? A. Yes.

"5. How far east of the Ash truck could Georgia Kline have seen it if she had been watching in a careful and discerning manner?  A.  We don't know—factors we can't determine such as eyesight.

"6. How fast was the Kline car traveling when Georgia Kline first saw the Ash truck?  A.  Neighborhood of 50 m.p.h.

"7. How fast was the Kline car traveling when it struck the Ash truck? A.  We do not know.  (From evidence of Mr. Kline approximately 15 m.p.h.)

"8. How wide was the roadway where the Kline car struck the rear of the Ash truck?  A.  21 to 23 feet.

"9. How far south of the center of the roadway was the farthest north portion of the Ash truck?  A.  1 ft. and 8".

"10. At the speed which you find the Kline car was traveling in your answer to Question No. 6, what was the distance in feet required to bring the Kline car to a stop or under such control as to avoid colliding with the Ash truck under the existing circumstances?  A.  We can't fairly estimate due to too many conditions.

"11. Was Harry Kline travelling with at least part of the Kline automobile in the south traffic lane when approaching the Ash truck?  A.  Yes.

"12. Did Georgia Kline make any objection to the speed at which Harry Kline was driving while travelling toward the bridge where the collision occurred?  A.  No.

"13. If you answer Question No. 12 'yes', then state what Georgia Kline said and how far east of the Ash truck she was when she said it?  A.  —.

"14. Did Georgia Kline make any objection to Harry Kline's driving partially or entirely in the south traffic lane while travelling toward the bridge where the collision occurred?  A.  No.

"15. If you answer Question No. 14 'yes', then state what Georgia Kline said and how far east of the Ash truck she was when she said it.  A.  —.

"16. If the Kline vehicle had been operated entirely in its own lane of traffic would the collision have occurred?  A.  Questionable.

"17. Was Georgia Kline familiar with the general character of the land where the accident occurred and know that such road was through rolling country?  A.  Yes.

"18. Were there any lights burning on the rear of defendant's truck at the time of the accident?  A.  We can't tell from the evidence whether the lights were actually on at the time of the collision or not.

"19. Do you find defendant committed any act of negligence which was the proximate cause of the accident?  A.  Yes.

"20. If your answer to Question No. 19 is 'yes', then state what was defendant's negligence.

A.  Parked on a bridge                        No displayed flares, lanterns, or
     Parked *on* wrong side of road                       red reflectors
                    Not leaving 20 feet clearance.

"21. Do you find that Georgia Kline committed any act of negligence which was the proximate cause of her injuries?  A.  No.

"22. If your answer to Question No. 21 is 'yes', then state what was Georgia Kline's negligence.  A."

Defendants objected because of the insufficiency of answers to questions 5, 7, and 10, and the jury was sent back for further deliberations thereon. The words, "From evidence of Mr. Kline approximately 15 m.p.h.", were added to the answers to question 7. The jury stated it was impossible for it to give better answers to questions 5 and 10. The verdict and answers were accepted and approved by the trial court on May 24, 1960. On September 5, 1960, defendants' motion to set aside answers to special questions 19, 20, and 21, their motion for judgment on the answers to special questions of the jury, and their motion for new trial were presented to and overruled by the trial court. This appeal was thereupon perfected. In connection with the record on appeal, it is helpful to this court when the notice of appeal is set out in full in the abstract which was not done by counsel in this case.

Many authorities are cited by counsel for the parties on both sides in this case but for all practical purposes, a similar situation existed in *Drake v. Moore*, 184 Kan. 309, 336 P. 2d 807. The only distinguishing feature is that the bridge in our present case was situated in a valley with rises at some distance to the west and east of it. We have already detailed how vehicles coming down the rise from the east would be unable to discern any object on the bridge especially when the owner or operator thereof had not seen fit to comply with statutory requirements as to lights and proper parking. In the Drake case a large truck had stalled on an incline and after passage of time spent by defendants in trying to get the truck started by towing it, plaintiff automobile ran into the rear of the truck which had no lights and was stopped and parked in the traveled portion of the roadway. The traveled portion of the roadway in the Drake case was concrete slab twenty-two feet wide while here the roadway was of heavy gravel or slag and approximately in the middle of it there was a well-defined single track which had been worn thereon by the vehicular traffic. There is no question but that plaintiff here proved several acts of negligence on the part of defendants, some of which were even admitted by them, and were set out in detail by the jury in the answer to special question 20. Any contributory negligence of the driver of the plaintiff automobile, or of the plaintiff herself was an affirmative defense which had to be proved by defendants. (*Hoff v. Johnston*, 186 Kan. 214, 219, 349 P. 2d 873.)

We turn next' to the answers to special questions by the jury.

The answers, which were based on abundant substantial competent evidence, not only fixed defendants' negligence as the proximate cause of the accident but made clear there was no finding of negligence either on the part of Harry Kline, the driver of the plaintiff automobile, or on the part of Georgia Kline, plaintiff. Therefore, we must conclude, as did the jury, there was no competent substantial evidence to show any such negligence on the part of the Klines. The trial court apparently reached the same conclusion when it accepted and adopted the verdict of the jury and the answers to the special questions.

Under the Drake case the complaint of defendants as to the trial court's ruling on the demurrer is well answered and we hold here, as there, that the demurrer was properly overruled.

Defendants argue the theory of assumption of risk but we remain unconvinced from their argument and the record before us that there is any application of that doctrine because when the danger was apparent to one of the Klines, it was apparent to both. Mrs. Kline warned of the danger and Mr. Kline immediately applied his brakes and laid down 127 feet of skidmarks. Similarly we cannot see there was such knowledge and appreciation of danger and peril on the part of both of the Klines, or either of them, as would make it proper to consider the doctrine of assumption of risk. (*Kleppe v. Prawl*, 181 Kan. 590, 594, 313 P. 2d 227; 63 A. L. R. 2d 175.)

Other complaints of error are noted but in view of the discussion herein, we think they have been sufficiently answered.

Judgment affirmed.